IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | |
|---|---|
| **HEMP QUARTERS 605 LLC,**<br><br>    Plaintiff,<br><br>vs.<br><br>**GOVERNOR KRISTI NOEM, in her official capacity as Governor of the State of South Dakota; ATTORNEY GENERAL MARTY JACKLEY in his official capacity as Attorney General of the State of South Dakota; CASEY DEIBERT; in her official capacity as State's Attorney for Hughes County, South Dakota,**<br><br>    Defendants. | 3:24-CV-3016<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff, Hemp Quarters 605 LLC ("Hemp Quarters"), by and through counsel, for its Complaint against Defendants; the State of South Dakota; Governor Kristi Noem, in her official capacity as Governor of the State of South Dakota ("Governor Noem"); Attorney General Marty Jackley ("Attorney General Jackley"), in his official capacity as Attorney General of the State of South Dakota; and Casey Deibert; in her official capacity as State's Attorney for Hughes County, South Dakota, (collectively, "Defendants"), state and allege as follows:

### INTRODUCTORY STATEMENTS

1.    This is a lawsuit challenging "[a]n act to prohibit the chemical modification or conversion of industrial hemp and the sale or distribution of chemically modified or converted industrial hemp and to provide a penalty therefore" ("HB 1125"[1]) of the 99th South Dakota

---

[1] HB 1125 was signed into law on March 18, 2024. Thus, it is no longer a "house bill." But the Act has not received a unique identifying number and will amend the already existing Industrial Hemp Act, codified at SD CODIFIED LAWS § 38-35-1 *et seq*. Accordingly, Plaintiff is referring to the amended sections by its house bill number, HB 1125, for brevity and clarity.

Legislative Session, which attempts to recriminalize certain hemp-derived cannabinoid products and obstruct the shipment and transportation of the same, in direct conflict with well-established federal laws encouraging the redevelopment of a domestic supply chain of hemp and hemp products in South Dakota and across the country.

2.      The Plaintiff in this case retails hemp plants and hemp-derived products in South Dakota. Plaintiff has benefitted for several years from operating within a legal market through a supply chain of numerous farmers, processors, wholesalers, and retail shops throughout South Dakota and much of the nation. South Dakota businesses – including Plaintiff – will suffer immediate, irreparable financial harm, and many will be forced to close and/or lay off employees if HB 1125 goes into effect on July 1, 2024.

3.      On December 20, 2018, President Donald Trump signed into law the Agriculture Improvement Act of 2018, Pub. L. 115-334 (the "2018 Farm Bill"). The 2018 Farm Bill established a framework for the domestic supply chain of hemp and hemp products in three important ways. First, it permanently decoupled hemp from marijuana under the Controlled Substances Act and exempted hemp-derived tetrahydrocannabinol (THC) from its definition. Second, it deliberately expanded the definition of "hemp" to include "all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 1639o(1). Third, it expressly prohibited individual states from interfering with the transportation and shipment of hemp and hemp products through interstate commerce.

4.      In general, as courts throughout the country have affirmed, the only relevant statutory metric in analyzing whether a product is to be considered hemp or marijuana under the 2018 Farm Bill is the concentration of Delta-9 THC on a dry weight basis. If the product has 0.3

percent Delta-9 THC or less on a dry weight basis, then it is hemp. If the product contains more than 0.3 percent Delta-9 THC on a dry weight basis, it is marijuana.

5.      Nothing in the 2018 Farm Bill limits the concentration of Delta-8 THC extracted from hemp, which occurs naturally in the Cannabis sativa L. plant.

6.      The 2018 Farm Bill's re-establishment of a domestic supply chain of hemp and hemp products has led to a robust hemp-derived cannabinoid market in South Dakota and across the country. (*See* HB 1008 of the 95th Legislative Session of South Dakota creating a framework for the research, growth, and sale of industrial hemp in South Dakota).

7.      The existing hemp-derived cannabinoid market that farmers, small business owners, and consumers have built and relied on over the last four years would be eliminated under HB 1125 because the new law impermissibly narrows the definition of hemp to recriminalize the possession, manufacturing, transportation, and shipment of certain popular hemp-derived cannabinoid products. This would lead to a signficant loss of jobs around the state and turn farmers, business owners, and consumers – including Plaintiff – into criminals overnight, despite no change in federal law.

8.      In 2016, the owners of Hemp Quarters 605, LLC had a labrador dog that suffered from a tumor. At that time, the owners of Hemp Quarter 605, LLC owned a pet store in Pierre, South Dakota. Since their dog was suffering from a tumor, they began to sell CBD products for pets. After the success of these hemp derived CBD products, they began to sell hemp products for human consumption after the passing of the 2018 Farm Bill. Ultimately, the hemp business outgrew the pet store, so the pet store was closed, and Hemp Quarters was opened in 2020. Since that time, Hemp Quarters has grown to be the largest hemp store in central South Dakota. Approximately, 60-70% of Hemp Quarters's business is hemp derived products. Therefore, Hemp

Quarters 605, LLC risks losing everything if HB 1125 takes effect. Consequently, Hemp Quarters's entire investment is threatened by HB 1125.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391.

11.     Declaratory relief is authorized by Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201, 2202.

12.     This action is also brought pursuant to 42 U.S.C. § 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States.

## THE PARTIES

13.     Hemp Quarters 605 LLC is a South Dakota Limited Liability Company with its principal place of business in Pierre, South Dakota. Hemp Quarters owns and operates the largest vape and smoke shop in central South Dakota. Hemp Quarters is a retail store offering, among other things, hemp extract products to South Dakota consumers and businesses.

14.     Governor Noem is charged with the executive authority of state government for the State of South Dakota, including the administration and enforcement of the laws of South Dakota. Governor Noem is sued in her official capacity due to her signing of HB 1125 into law and her role as chief executive overseeing law enforcement.

15.     Attorney General Marty Jackley is charged with enforcing the laws of South Dakota. Attorney General Jackley is sued in his official capacity due to his enforcement authority pursuant to HB 1125.

16.    Casey Deibert is a State's Attorney for Hughes County, South Dakota. She is sued her official capacity only, as a State's Attorney for Hughes County, South Dakota, a position in which she acts under color of law to enforce South Dakota's criminal laws, including HB 1125.

17.    On information and belief, Defendants will each exercise their discretion and legal authority to implement and enforce HB 1125.

18.    Plaintiff seeks a temporary and permanent injunction, and in the alternative, if necessary, a temporary restraining order, to prevent the enforcement of HB 1125 pending the outcome of this litigation.

## FACTS

19.    On February 7, 2014, President Barack Obama signed into law the Agricultural Act of 2014, Pub L. No. 113-79 (the "2014 Farm Bill"). The 2014 Farm Bill provided that "[n]otwithstanding the Controlled Substances Act . . . or any other Federal law, an institution of higher education . . . or a State department of agriculture may grow or cultivate industrial hemp," provided it is done "for purposes of research conducted under an agricultural pilot program or other agricultural or academic research" and those activities are allowed under the relevant state's laws. 7 U.S.C. § 5940(a).

20.    The 2014 Farm Bill defines "industrial hemp" as the "plant Cannabis sativa L. and any part of such plant, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weigh basis." 7 U.S.C. § 5940(a)(2).

21.    The 2014 Farm Bill defines an "agricultural pilot program" as a "pilot program to study the growth, cultivation, or marketing of industrial hemp . . . in States that permit the growth or cultivation of industrial hemp under the laws of the state in a manner that[:] ensures that only institutions of higher education and State departments of agriculture are used to grow or cultivate

industrial hemp[;] requires that sites be used for growing or cultivating industrial hemp[;] requires that sites used for growing or cultivating industrial hemp in a State be certified by, and registered with, the State department of agriculture[;] and authorizes State departments of agriculture to promulgate regulations to carry out the pilot program in the States in accordance with the purposes of [Section 7606 of the 2014 Farm Bill]." 7 U.S.C. § 5940(a)(2).

22.    The 2014 Farm Bill made the federal government's intentions clear: hemp with low levels of Delta-9 THC is to be treated as an agricultural commodity once again in the United States.

23.    On December 20, 2018, President Donald Trump signed into law the 2018 Farm Bill. A copy of the 2018 Farm Bill is attached in pertinent part as Exhibit 1.

24.    The 2018 Farm Bill permanently removed hemp and THCs in hemp from the Controlled Substances Act and required the United States Department of Agriculture ("USDA") to be the sole federal regulator of hemp production, leaving no role for the Drug Enforcement Agency ("DEA").

25.    The 2018 Farm Bill expanded the definition of hemp by defining it as the "plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 1639o(1) (emphasis added). Thus, the 2018 Farm Bill's expansion broadly redefined hemp as including all products derived from hemp, so long as the Delta-9 THC concentration is not more than 0.3 percent on a dry weight basis, and it is agnostic on manufacturing processes.

26.    The Conference Report for the 2018 Farm Bill made it clear that Congress intended to preclude a state from adopting a more restrictive definition of hemp: "state and Tribal governments are authorized to put more restrictive parameters on the production of hemp, but are

not authorized to alter the definition of hemp or put in place policies that are less restrictive." Conference Report for Agricultural Improvement Act of 2018, p. 738. A true and accurate copy of the relevant pages from the Conference Report is attached as Exhibit 2.

27.     The 2014 Farm Bill made clear that Congress intended the facilitate a market for hemp as an agricultural commodity, and the expanded definition of hemp in the 2018 Farm Bill made clear that Congress intended for the hemp industry to be innovative in exploring, creating and sustaining viable submarkets beyond grain and fiber to incorporate consumable products as well, limited only by the delta-9 THC concentration levels.

28.     The 2018 Farm Bill required the USDA to issue regulations and guidelines for states to implement the relevant hemp portions of the 2018 Farm Bill as well as regulations and guidelines for states that choose not to regulate the production of hemp in their borders. The fact that a farmer could grow hemp under a federal license if a state chose not to create its own regulatory program demonstrates Congress' resolve to re-establish a domestic supply chain of hemp and hemp products. 7 U.S.C. § 1639r(a)(1)(A).

29.     According to the USDA's Final Rule, "produce" is a common agricultural term that means "[t]o grow hemp plants for market, or for cultivation for market, in the United States." 7 C.F.R. § 990.1.

30.     The Final Rule further demonstrated that the 2018 Farm Bill preserved the authority of individual states to regulate the act of producing hemp if they chose to do so (e.g. set back requirements, performance based sampling), but individual states could not alter the definition of hemp or regulate Hemp in a manner that reaches beyond production. In other words, the 2018 Farm Bill permits states to regulate the production, i.e., cultivation, of hemp if they chose to do so, but nothing more.

31.    Significantly, the 2018 Farm Bill expressly prohibits states from blocking the transportation or shipment of hemp and hemp products produced in accordance with the 2018 Farm Bill:

SEC. 10114. INTERSTATE COMMERCE.

(a) Rule of Construction. Nothing in this title or an amendment made by this title prohibits the interstate commerce of hemp (as defined in section 297A of the Agricultural Marketing Act of 1946 (as added by section 10113)) or hemp products.

(b) Transportation of Hemp and Hemp Products. No State or Indian Tribe shall prohibit the transportation or shipment of hemp or hemp products produced in accordance with subtitle G of the Agricultural Marketing Act of 1946 (as added by section 10113) through the State or the territory of the Indian Tribe, as applicable.

32.    This explicit protection for hemp and hemp products in interstate commerce would be rendered meaningless if individual states were permitted to criminalize certain hemp and hemp products and frustrate the overarching goal of the 2014 and 2018 Farm Bills, which is to treat hemp and hemp products like a commodity once again.

33.    The overarching goal of treating hemp and hemp products like a commodity is further illustrated by the USDA specifically adding hemp to the Agricultural Technical Advisory Committee ("ATAC") for Trade in Tobacco, Cotton, and Peanuts.[2] There are a total of six (6) ATACs that advise the Secretary of Agriculture and the U.S. Trade Representative about a variety of agricultural trade matters.

34.    Furthermore, the General Counsel for the USDA has authored a memorandum discussing the prohibition on states restricting the transportation or shipment of hemp, concluding

---

[2]    *See* https://www.federalregister.gov/documents/2023/06/13/2023-12649/amendment-notice-of-intent-for-agricultural-policy-advisory-committee-apac-and-the-related (last visited July 31, 2023)

that any state law purporting to do so has been preempted by Congress. A true and accurate copy of the USDA Memorandum is attached as Exhibit 3.

35.     In short, the 2018 Farm Bill (1) broadly defined hemp as including all extracts and derivatives whether growing or not, (2) legalized all hemp products with a Delta-9 THC concentration of not more than 0.3 percent on a dry weight basis, (3) is agnostic on the manufacturing processes for finished hemp products, and (4) mandated that no state or Indian tribe could prohibit the transportation or shipment of hemp and hemp products in interstate commerce.

## SOUTH DAKOTA'S HB 1125 IS UNCONSTITUTIONAL

36.     In 2020, in response to the 2018 Farm Bill, South Dakota passed Session Law 2020, ch 176, § 1 et seq., which decoupled hemp from marijuana by removing a broad definition of hemp including all such hemp containing not more than 0.3 percent of tetrahydrocannabinol on a dry weight basis from the State's Controlled Substances Act.[3]

37.     The hemp-derived cannabinoid market in South Dakota that had operated smoothly for years is now threatened with extinction after Governor Noem signed House Bill 1125 into law on March 18, 2024.

38.     Although HB 1125 properly excluded hemp derived-cannabinoid products from the State's definition of marijuana, it impermissibly narrows the definition of hemp by recriminalizing certain popular hemp-derived cannabinoid products. In fact, HB 1125 goes so far as to recriminalize all hemp products "chemically modif[ied] or convert[ed]" or that contain "chemically derived cannabinoids"—including Delta-8 and Delta-9 THC; despite there not being a "chemically modified/derived/converted" distinction permitted by federal law.  HB 1125 goes

---

[3]     A copy of Session Law 2020, ch 176, § 1 et seq. can be found at https://sdlegislature.gov/Statutes/38-35

even a step further to only permit "non-psychoactive cannabinoids" ("CBD"), which is self-defeating as CBD itself is understood to be "psychoactive" by industry experts (as are sugar and caffeine).

39.    HB 1125 also interferes with the interstate transportation and shipment of hemp and hemp products in direct violation of the express language of the 2018 Farm Bill. On its face, if one cannot possess certain hemp and hemp products declared legal under federal law, then one cannot transport or ship it, either. HB 1125 attempts, but fails, to cure this defect by inserting the following licensing provisions:

> Any transporter is deemed to have given consent to the reasonable search and seizure by law enforcement of any hemp without a warrant to determine the lawful amount of total delta-9 tetrahydrocannabinol concentration. For purposes of this section, product in process that is properly documented is compliant. Any law enforcement officer may require any transporter to stop for the purposes of inspection. During a stop, a law enforcement officer may collect a sample of any hemp for the purpose of testing for any concentration of total delta-9 tetrahydrocannabinol that exceeds three-tenths of one percent on a dry weight basis. Each sample collected by law enforcement may not exceed eight ounces.
> It is a Class 2 misdemeanor to transport industrial hemp or product in process, but not industrial hemp product, without appropriate documentation demonstrating compliance with an industrial hemp program of a federal, state, or tribal authority, in addition to any permit or documentation required by § 38-35-17.

(SD CODIFIED LAW § 38-35-16).

> If the transporter is not a grower licensee, that transporter shall have in the transporter's possession the following documentation:
> (1) A copy of the license under which the industrial hemp was grown or produced;
> (2) A laboratory report produced by a Drug Enforcement Administration-registered laboratory that confirms the lot of origin of all hemp being transported complies with 7 U.S.C. Chapter 38, Subchapter VII, as provided in 7 C.F.R 990.70(d) and 990.71(d) in effect as of March 22, 2021;
> (3) A signed affirmation from the licensee and the transporter that no illicit drugs or variations of hemp not explicitly authorized by 7 U.S.C. Chapter 38, Subchapter VII will be transported; and

> (4) A bill of lading or manifest that includes the shipment contents, the specific name and address of the transporter, the specific name and address of the origin and lot of origin, the destination of the shipment, the total weight of the load, and the type of vehicle being used.
> Failure to possess the appropriate documentation pursuant to this section is a Class 2 misdemeanor.

(*Id.*, Section 38-35-17).

40.     Hemp Quarters orders, transports, and ships hemp-derived cannabinoid products like Delta-8 THC into and through South Dakota, either directly or through third-party distributors. Under HB 1125, its employees face criminal liability for transporting and shipping hemp products if they failed to demonstrate the products were "produced in accordance with 7 U.S.C. § 1639o et seq."

41.     As a result of HB 1125, Plaintiff is in jeopardy of criminal prosecution for selling, possessing, transporting, or shipping certain hemp-derived cannabinoid products if law enforcement personnel act on HB 1125. In that scenario, Plaintiff will be precluded from selling, transporting, and shipping an agricultural commodity despite controlling and preemptive federal law.

### COUNT I: DECLARATORY JUDGMENT FOR VIOLATION OF THE 2018 FARM BILL

42.     Plaintiff alleges and incorporates by reference all allegations in the paragraphs above.

43.     An actual and justiciable controversy exists between Plaintiff and Defendants regarding the lawfulness of hemp and hemp products.

44.     HB 1125 places Plaintiff in jeopardy of criminal prosecution and precludes Plaintiff from shipping, transporting, wholesaling, packaging, processing, and retailing hemp extract products deemed legal by federal law.

45. Pursuant to 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure, Plaintiff requests a declaration that HB 1125 violates the 2018 Farm Bill and is preempted by federal law.

46. The 2018 Farm Bill legalized all hemp products with a Delta-9 THC concentration of not more than 0.3 percent on a dry weight basis and prohibited states from curtailing the transport and shipment of hemp or hemp products through interstate commerce.

47. HB 1125 violates both of these aspects of the 2018 Farm Bill. It attempts to revise federal law to reclassify certain hemp and hemp-derived cannabinoids as illegal controlled substances and interferes with the free flow of interstate transportation and shipment of hemp products.

48. HB 1125 imposes an impermissible, narrower definition of hemp than mandated by the federal government in the 2018 Farm Bill, despite Congress' declaration that states are not permitted to modify the definition of hemp, and despite South Dakota's new definition having the effect of eliminating "chemically modified" hemp. If states were permitted to selectively criminalize parts of the hemp plant, it renders the protections Congress provided to hemp and hemp products in the stream of commerce meaningless.

49. Moreover, by carving certain hemp-derived cannabinoids out from the definition of hemp, HB 1125 attempts to adopt a definition that conflicts with the federal standard, which includes all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a Delta-9 THC concentration of not more than three-tenths of one percent (0.3%) on a dry weight basis (such as Delta-8 THC).

50. HB 1125 runs counter to the plain and unambiguous reading of the 2018 Farm Bill as well as its intent as evidenced by a letter from the then-Chairman of the House Agriculture

Committee Congressman David Scott and the then-House Appropriations Subcommittee on Agriculture, Rural Development, Food and Drug Administration, and Related Agencies to the United States Department of Justice and the DEA:

> Congress did not intend the 2018 Farm Bill to criminalize any stage of legal hemp processing, and we are concerned that hemp grown in compliance with a USDA-approved plan could receive undue scrutiny from the DEA as it is being processed into a legal consumer-facing product under this IFR. That is why the 2018 Farm Bill's definition of hemp was broadened from the 2014 Farm Bill's version to include derivatives, extracts and cannabinoids. It was our intent that derivatives, extracts and cannabinoids would be legal if these products were in compliance [with] all other Federal regulations.

A true and accurate copy of Congressmen's Scott and Bishop, Jr.'s letter is attached as Exhibit 4.

51.    HB 1125 is also in direct conflict with the DEA's own determinations that Delta-8 THC and every other hemp-derived cannabinoid product with no more than 0.3 percent Delta-9 THC on a dry weight basis is considered hemp and not a controlled substance under federal law.

52.    On June 24, 2021, during a recorded Florida Department of Agriculture and Consumer Services webinar, DEA representative Sean Mitchell stated:

> I also just want to expand beyond delta-8. There's delta-8, there's delta-10, there's all kind of different uh cannabinoids that uh are associated with cannabis sativa l that are kind of out there and making the rounds. So what I want to say, and I'll be very, very deliberate and clear. At this time, I repeat again, at this time, per the Farm Bill, the only thing uh that is a controlled substance is delta-9 THC greater than 0.3% based on a dry weight basis.[4]

53.    On August 19, 2021, the Alabama Board of Pharmacy requested the control status of Delta-8 THC under the Controlled Substances Act. On September 15, 2021, the DEA concluded that ". . . cannabinoids extracted from the cannabis plant that have a Δ 9 -THC concentration of

---

[4] *See Town Hall with USDA and DEA Dated June 29, 2021, available at* https://tinyurl.com/mr2n28hx, at 9:00 minutes (last visited July 31, 2023).

not more than 0.3 percent on a dry weight basis meet the definition of 'hemp' and thus are not controlled under the CSA." Furthermore, according to the response, the DEA considers unlawful "synthetic" THC products to be those that are "produced from non-cannabis materials." A true and accurate copy of the DEA's response to the Alabama Board of Pharmacy is attached as Exhibit 5.

54.    Furthermore, DEA's official promulgations in the Federal Register, at 21 C.F.R. § 1308.11(31)(ii), declares that: "(ii) Tetrahydrocannabinols does not include any material, compound, mixture, or preparation that falls within the definition of hemp set forth in 7 U.S.C. 1639o."

55.    In addition, by criminalizing hemp derivatives like Delta-8 THC, HB 1125 prohibits the transport of hemp products in and through South Dakota in direct contradiction of Section 10114 of the 2018 Farm Bill.

56.    Federal law preempts HB 1125, which is in conflict with the 2018 Farm Bill pursuant to the Supremacy Clause of the Constitution of the United States and conflicts of laws principles. U.S. Const. art. VI, cl. 2.

57.    Plaintiff has been and will be harmed by HB 1125, as it is unable to transport, manufacture, possess, or sell hemp products that have been declared to be legal under federal law.

### COUNT II: DECLARATORY JUDGMENT FOR VIOLATION OF THE COMMERCE CLAUSE

58.    Plaintiff alleges and incorporates by reference all allegations in the paragraphs above.

59.    As explained above, hemp-derived cannabinoids, such as Delta-8 THC, are hemp products declared legal by the 2018 Farm Bill.

60.    HB 1125's prohibition on the possession of "chemically modified" hemp-derived cannabinoids, and its implied prohibition on the transportation of all such hemp products, is a

substantial burden on interstate commerce in violation of the Commerce Clause of the Constitution of the United States as there is no federal license to transport finished hemp products. U.S. Const. art. I, § 8, cl. 3.

61.    Plaintiff have been, and will be, harmed by HB 1125, as it is unable to transport hemp-derived cannabinoids products that have been declared legal under federal law in and through South Dakota.

## COUNT III: REGULATORY TAKING

62.    Plaintiff alleges and incorporates by reference all allegations in the paragraphs above.

63.    Defendants' regulatory scheme results in an impermissible regulatory taking because it effectively creates a total ban of hemp containing any amount of tetrahydrocannabinol.

64.    Specifically, SD Codified Laws § 38-35-2 permits the sale of hemp-derived products. HB 1125 then amends "hemp derived product" to mean "a finished manufactured product, or consumer product made from industrial hemp with a total delta-9 tetrahydrocannabinol concentration of not more than three-tenths of one percent, derived from or made by processing industrial hemp . . . [not including] Delta-8 tetrahydrocannabinol . . . ." (HB 1125, Section 3(7).) But then HB 1125 continues by making it illegal to "[c]hemically modify or convert industrial hemp as defined in § 38-35-1, or engage in any process that converts cannabidiol, into delta-8 tetrahydrocannabinol, delta-9 tetrahydrocannabinol, delta-10 tetrahydrocannabinol, or any other tetrahydrocannabinol isomer, analog, or derivative." (Id., at Section 2(1)) This effectively bans all hemp-derived products containing THC, even if the product contains 0.3 percent or less Delta-9 THC as encompassed by the broad definition of hemp under the 2018 Farm Bill. 7 U.S.C. §

1639o(1). For example, popular full spectrum CBD products—long since accepted as legal and highly popular with adult consumers—would be criminalized under this approach.

65.    HB 1125 key provisions are preempted by federal law because they infringe on Plaintiff's constitutional rights so as to amount to a regulatory taking under the Constitution of the United States. Plaintiff has made substantial investments in its business based on the established regulatory scheme that existed in South Dakota prior to HB 1125. As of July 1, 2024, Plaintiff's investments, inventory, and entire segments of its business will be deemed worthless. Businesses with hemp inventory, including Hemp Quarters, have no other course of remedy but to bring this lawsuit.

66.    HB 1125 infringes upon the investment-backed expectations and industries in which Plaintiff, and other South Dakota citizens, have built their livelihoods. For this same reason, the regulatory scheme in HB 1125 amounts to a deprivation of all, or substantially all, beneficial economic use of Plaintiff's hemp line of business in South Dakota.

67.    By way of HB 1125's infringement upon Plaintiff's business, it has overly burdened Plaintiff and taken its property without just compensation.

## COUNT IV: VOID FOR VAGUENESS

68.    Plaintiff alleges and incorporates by reference all allegations in the paragraphs above.

69.    The Due Process Clause of the Fifth and Fourteenth Amendments to the U.S. Constitution prohibit criminal enforcement of statutory and regulatory requirements that are unconstitutionally vague and do not give fair warning of their requirements. U.S. Const. Amend. V, XIV.

70.    For instance, Section 1 of HB 1125 permits chemically modified hemp products that contain "non-psychoactive cannabinoids" (thereby banning "chemically modified" products that contain "psychoactive" CBDs if they are not "naturally occurring" or not used in a "topical cream"); but "non-psychoactive" is a term that is undefined and overly broad so as to potentially ban any hemp-derived cannabinoid product that includes any trace amount THC or CBD. HB 1125 is further void for vagueness because the distinction between a "non-psychoactive," "chemically modify," "convert," "naturally occurring," and "chemical catalyst"—phrases that are apparently supposed to clarify what is permitted—are likewise undefined and, if understood literally, would be contradicted by HB 1125's own definition of "hemp."

71.    HB 1125 fails to give a person of ordinary intelligence fair notice as to what contemplated conduct is forbidden and what is permitted with regard to the possession, transportation, and shipment of the products it seeks to ban. Plaintiff and the end-users in the stream of commerce will be left to guess at the meaning of the new law. "The standard for a void for vagueness claim in violation of due process is whether the prohibited act or omission is expressed in terms so vague that reasonable people of ordinary intelligence might apply it differently." Donat v. Johnson, 2015 S.D. 16, ¶ 27, 862 N.W.2d 122, 132.

72.    The confusion only abounds when viewing the internal inconsistencies in South Dakota's currently enacted laws and HB 1125. First, Section 2 of HB 1125 provides that it is illegal to chemically modify hemp "as defined in § 38-35-1;" but "all derivatives, extracts, cannabinoids, isomers" are included in the definition of "hemp" as defined by Section 38-35-1. To further complicate matters, South Dakota law states that tetrahydrocannabinol is a controlled Schedule I substance, "except that which occurs in industrial hemp as defined in § 38-35-1." § 34-20B-14(20) (emphasis added). Again, HB 1125's definition of "hemp" is essentially the same definition as

used by the 2018 Farm Bill, including the "all derivatives" phrase. In other words, HB 1125's broad definition of "hemp" includes "all derivatives" of Cannabis sativa L., which includes commonly used hemp-derived products; but then Section 2 of HB 1125 makes it illegal to chemically modify, sell, or distribute "chemically modified" hemp (intending to undermine the "all derivatives" portion of § 38-35-1(5) while simultaneously relying on the definition to support criminalization); but then Section 34-24B-14(20) decriminalizes the same hemp criminalized in Section 2, but without any distinction between "chemically modified" hemp or not.

73.    HB 1125 exposes Plaintiff to criminal prosecution, and when and to what extent HB 1125 applies to Plaintiff is difficult for even a well-trained lawyer to understand. As enacted, HB 1125 is unconstitutionally vague.

## COUNT V: INJUNCTIVE RELIEF

74.    Plaintiff alleges and incorporates by reference all allegations in the paragraphs above.

75.    Plaintiff is likely to succeed on the merits of its challenge to HB 1125 given that it openly conflicts with the 2018 Farm Bill and the Supremacy and Commerce Clauses of the Constitution of the United States, constitutes an impermissible regulatory taking, and is void for vagueness in violation of the Due Process Clause of the Fifth and Fourteenth Amendments.

76.    Unless enjoined in its entirety, HB 1125 already has, and will continue to, cause harm to Plaintiff by placing it in jeopardy of criminal prosecution and depriving it the ability to cultivate, wholesale, distribute, and retail hemp plants and hemp-derived products that are declared legal by federal law.

77.    Plaintiff has no adequate remedy at law and faces irreparable harm unless this Court enjoins HB 1125 in its entirety as described herein. Plaintiff's irreparable harm includes rendering its inventory of hemp crops and hemp-derived products utterly worthless, exposing it to criminal

liability, and inhibiting it from transporting or shipping commodities declared legal under the 2018 Farm Bill.

78.    Plaintiff is likely to succeed on the merits of this action.

79.    The balance of harms weighs in favor of Plaintiff, as the injunction will not harm Defendants; it will simply place Defendants back into compliance with federal law.

80.    An injunction is in the public's interests, as South Dakota is not permitted to ignore federal law or criminalize conduct that has been declared legal under federal law.

81.    Plaintiff is entitled to a temporary and permanent injunction, with respect to the Industrial Hemp Act and, if necessary, Plaintiff is entitled to a temporary restraining order so that Plaintiff does not suffer any harm while Plaintiff's claims and requests for relief are being adjudicated on the merits of Plaintiff's claims.

WHEREFORE, Plaintiff respectfully request that the Court:

(a)    Set this matter for a prompt hearing on Plaintiff's request for a temporary injunction and/or temporary restraining order;

(b)    Enter judgment in its favor and against Defendants;

(c)    Declare HB 1215 void in its entirety and declare all hemp plants and hemp-derived cannabinoid products that comply with the federal definition of hemp, such as Delta-8, as legal under federal law, which preempts South Dakota's effort to recriminalize them through HB 1125; and

(d)    Issue a temporary restraining order or preliminary injunction, later to be made permanent, enjoining Defendants (including other persons in concert or participation with them or under their directive or authority, including but not limited to law enforcement personnel and prosecutors' offices) from enforcing HB 1125 in its entirety and from taking any steps to enforce,

criminalize, or prosecute the sale, possession, manufacture, financing, distribution, or transportation of hemp-derived cannabinoids that do not exceed 0.3 percent Delta-9 THC on a dry weight basis;

    (e)    Award Plaintiff its costs and attorneys' fees incurred in bringing this action; and

    (f)    Award Plaintiff all other just and proper relief.

Dated this 13th day of June, 2024.

/s/ Nicholas G. Moser
Nicholas G. Moser, SDSB#4650
Marlow, Woodward & Huff, Prof. LLC
PO Box 667-200 W. 3rd St.
Yankton, SD 57078
Tel: (605) 665-5009
Fax: (605) 665-4788
E-mail: nick@mwhlawyers.com
**ATTORNEYS FOR PLAINTIFF**

Abtin Mehdizadegan (2013136)
Joseph Stepina (2020124)
Jacob Oneal Sutter (2023040)
Hall Booth Smith, P.C.
200 River Market Avenue, Suite 500
Little Rock, AR 72201
Tel: (501) 214-3499
Fax: (501) 604-5566
E-mail: abtin@hallboothsmith.com
E-mail: jstepina@hallboothsmith.com
E-mail: jsutter@hallboothsmith.com
*Pro hac vice applications forthcoming*
**ATTORNEYS FOR PLAINTIFF**

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| **I. (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| HEMP QUARTERS 605 LLC | GOVERNOR KRISTI NOEM, in her official as Governor of the State of South Dakota et al |

**(b)** County of Residence of First Listed Plaintiff    Hughes, SD
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Hughes, SD
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Nicholas G. Moser, Marlow, Woodward & Huff, Prof. LLC, P.O. Box 667, Yankton, SD 57078 (605) 665-5009

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product    Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument |    Liability   ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel &    Slander    Pharmaceutical Personal Injury | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'    Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted |    Liability   ☐ 368 Asbestos Personal | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and |
|    Student Loans | ☐ 340 Marine    Injury Product | | |    Corrupt Organizations |
|    (Excludes Veterans) | ☐ 345 Marine Product    Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment |    Liability   **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
|    of Veteran's Benefits | ☐ 350 Motor Vehicle   ☐ 370 Other Fraud |    Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) |    Exchange |
| ☐ 190 Other Contract |    Product Liability   ☐ 380 Other Personal |    Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal    Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise |    Injury   ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| | ☐ 362 Personal Injury -    Product Liability |    Leave Act | | ☐ 895 Freedom of Information |
| |    Medical Malpractice | ☐ 790 Other Labor Litigation | |    Act |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights   **Habeas Corpus:** |    Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 899 Administrative Procedure |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee | |    or Defendant) |    Act/Review or Appeal of |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party |    Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/    Sentence | |    26 USC 7609 | ☒ 950 Constitutionality of |
| ☐ 245 Tort Product Liability |    Accommodations   ☐ 530 General | | |    State Statutes |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -   ☐ 535 Death Penalty | **IMMIGRATION** | | |
| |    Employment   **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities -   ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| |    Other   ☐ 550 Civil Rights |    Actions | | |
| | ☐ 448 Education   ☐ 555 Prison Condition | | | |
| |    ☐ 560 Civil Detainee - | | | |
| |     Conditions of | | | |
| |     Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §§ 2201, 2202

Brief description of cause:
Constitutional Challenge, Declaratory Judgment, Injunctive Relief

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE        DOCKET NUMBER

DATE
06/11/2024

SIGNATURE OF ATTORNEY OF RECORD
*Nicholas N*

**FOR OFFICE USE ONLY**

RECEIPT #      AMOUNT      APPLYING IFP      JUDGE      MAG. JUDGE

JS 44 Reverse (Rev. 12/12)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)    Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)    County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)    Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. **(See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.    Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.    Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.    Origin.** Place an "X" in one of the six boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

**VI.    Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553   Brief Description: Unauthorized reception of cable service

**VII.    Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.    Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.