UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | | |
|---|---|---|
| HEMP QUARTERS 605 LLC, | ) | |
| | ) | 3:24-CV-03016-ECS |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| GOVERNOR KRISTI NOEM, IN HER | ) | BRIEF IN SUPPORT OF MOTION |
| OFFICIAL CAPACITY AS | ) | FOR SUMMARY JUDGMENT |
| GOVERNOR OF THE STATE OF | ) | |
| SOUTH DAKOTA; ATTORNEY | ) | |
| GENERAL MARTY JACKLEY, IN | ) | |
| HIS OFFICIAL CAPACITY AS | ) | |
| ATTORNEY GENERAL OF THE | ) | |
| STATE OF SOUTH DAKOTA; AND | ) | |
| CASEY DEIBERT, IN HER | ) | |
| OFFICIAL CAPACITY AS STATE'S | ) | |
| ATTORNEY FOR HUGHES | ) | |
| COUNTY, SOUTH DAKOTA, | ) | |
| | ) | |
| Defendants. | ) | |

Defendants, Governor Kristi Noem (hereinafter "Noem" or "Governor") and Attorney General Marty Jackley (hereinafter "Jackley" or "Attorney General"), by and through counsel Grant M. Flynn, Assistant Attorney General, hereby respectfully submit this brief in support of the State's Motion for Summary Judgment along with the corresponding Statement of Undisputed Material Facts.

## INTRODUCTION

Summary judgment is proper where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Plaintiff commenced this action alleging that (1) South Dakota House Bill 1125 (HB 1125) impermissibly violates the Agricultural

Improvement Act of 2018 (2018 Farm Bill), (2) HB 1125 violates the Commerce Clause of the United States Constitution, (3) HB 1125 constitutes a "regulatory taking" as it effectively bans the sale and distribution of all hemp products containing THC in violation of the 2018 Farm Bill, and (4) HB 1125 is void for vagueness and violates Plaintiff's right to due process and the Fifth and Fourteenth Amendments to the United States Constitution.  *See generally* Doc. 1.  Plaintiff has not demonstrated an actual controversy genuinely in dispute through these claims, and Defendants are therefore entitled to summary judgment as a matter of law.

## FACTUAL BACKGROUND

Under the Federal Controlled Substances Act, both "marijuana" and "marihuana" refer to any part of the Cannabis sativa L. plant—whether it's growing or not—including its seeds, resin, and any products or compounds made from it.  SUMF, ¶ 1.  Meanwhile, "hemp" is defined as the same plant or any part of it, but only if it contains no more than 0.3% delta-9 THC by dry weight.  SUMF, ¶ 3.  If any part of the Cannabis sativa L. plant has more than 0.3% delta-9 THC, it's classified as a Schedule I controlled substance under federal law.  *See* 21 U.S.C. §§ 812, Schedule I, (c)(10), (17).

In 2018, Congress amended the Controlled Substances Act through the Agricultural Improvement Act of 2018 (hereinafter "2018 Farm Bill"), removing hemp from the federal definition of marijuana.  SUMF, ¶ 5-6.  Under this law, the USDA was directed to establish regulations for industrial hemp production.  SUMF, ¶ 8-9.  Additionally, States and Indian tribes can oversee hemp

2

production if they have a USDA-approved plan. *Id.* South Dakota, for example, has such a plan. *Id.* Importantly, the 2018 Farm Bill also prohibits states and tribes from blocking the transportation or shipment of legally produced hemp or hemp products through their territory. SUMF ¶ 11.

In response to the passage of the 2018 Farm Bill, the 99th Session of the South Dakota Legislature passed HB 1125, and the same was signed by the Governor on March 18, 2024, with an effective date of July 1, 2024. SUMF, ¶ 12-13. Most pertinent here, HB 1125 created a criminal penalty within SDCL § 34-20B-1-(3), to-wit:

> No person or entity may:
>
> (1) Chemically modify or convert industrial hemp as defined in § 38-35-1, or engage in any process that converts cannabidiol, into delta-8 tetrahydrocannabinol, delta9 tetrahydrocannabinol, delta-10 tetrahydrocannabinol, or any other tetrahydrocannabinol isomer, analog, or derivative; or
>
> (2) Sell or distribute industrial hemp or an industrial hemp product that contains chemically derived cannabinoids or cannabinoids created by chemically modifying or converting a hemp extract.
>
> A violation of this section is a Class 2 misdemeanor.

HB 1125. SUMF, ¶ 14. In addition, HB 1125 amended SDCL § 34-20B-1(3) to define "Chemically derived cannabinoid" as follows:

> a chemical substance created by a chemical reaction that changes the molecular structure of any chemical substance derived from the cannabis plant. *The term does not include:*
>
> (a) Cannabinoids produced by decarboxylation from a naturally occurring cannabinoid acid without the use of a chemical catalyst;

3

    (b) Non-psychoactive cannabinoids; or

    (c) Cannabinoids in a topical cream product.

SUMF, ¶ 15.

Plaintiff, Hemp Quarters 605 LLC, is a business located in Pierre, South Dakota. SUMF, ¶ 16. Plaintiff is a retailer who markets and sells hemp plants and hemp-derived products in South Dakota. SUMF, ¶ 17. Plaintiff's business is solely as a retailer; Plaintiff does not produce, manufacture, or chemically modify any hemp products. SUMF, ¶ 19. Plaintiff estimates that roughly 60 to 70% of its business is derived from hemp-derived products. SUMF, ¶ 20.

On June 13, 2024, months after the passage of HB 1125, and on the eve of its effective date, Plaintiff brought this action, alleging HB 1125 is unconstitutional because it is preempted by federal law, it violates the Commerce Clause, it constitutes a "regulatory taking", and it is void for vagueness. *See generally* Doc. 1.

## ANALYSIS

Plaintiff challenges the constitutionality of HB 1125, alleging that the statute is preempted by the 2018 Farm Bill, violates the Commerce Clause, constitutes an unconstitutional regulatory taking, and is impermissibly vague under the Due Process Clause. *See generally* Doc. 1. However, HB 1125 is a lawful exercise of the State's police powers and withstands all four constitutional challenges. The statute is not preempted by federal law, as the 2018 Farm Bill expressly preserves the right of states to adopt more restrictive regulations regarding hemp. SUMF, ¶ 10. Nor does HB 1125 interfere with

interstate commerce, as it narrowly targets the manufacture and sale—not the transportation—of chemically modified hemp products. SUMF, ¶ 12. Plaintiff's takings claim fails because any economic impact stems from a lawful regulatory act that does not amount to a taking for public use. *Mugler v. Kansas*, 123 U.S. 623, 668-69 (1887). Finally, HB 1125 is not unconstitutionally vague; it provides clear definitions and prohibitions that give adequate notice and prevent arbitrary enforcement. *Bio Gen, LLC*, 690 F. Supp. 3d at 940. Accordingly, HB 1125 is constitutionally sound and should be upheld in its entirety.

    A. *HB 1125 is not preempted by the 2018 Farm Bill.*

Plaintiff alleges that HB 1125 is facially unconstitutional as its provisions are preempted by federal statute, specifically the 2018 Farm Bill. Doc. 1, 11-14. The language of both the 2018 Farm Bill and HB 1125 make it clear that this is not the case. SUMF, ¶ 5-15.

"The general law of preemption is grounded in the Constitution's command that federal law 'shall be the supreme Law of the Land.'" *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1021-22 (8th Cir. 2015) (quoting *In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Practices Litig.*, 621 F.3d 781, 791 (8th Cir. 2010)). This foundational principle—commonly known as the Supremacy Clause—establishes that federal law overrides conflicting state laws when Congress has acted within its constitutional authority. However, courts have consistently emphasized that the doctrine of preemption is not to be applied lightly. As the Eighth Circuit reiterated, "Congress does not cavalierly

5

pre-empt state-law causes of action." *Id.* (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d. 700 (1996)).

In determining whether federal law should be interpreted as preempting state law, courts operate with a presumption against preemption in areas traditionally regulated by the states. "In the interest of avoiding unintended encroachment on the authority of the States, … a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption." *Id.* at 1022 (quoting *Heart of Am. Grain Insp. Serv., Inc. v. Mo Dep't of Agric.*, 123 F.3d 1098, 1103 (8th Cir. 1997)). This judicial hesitancy reflects the longstanding respect for the role of states in regulating matters such as health, safety, and agriculture—areas where states have historically exercised broad police powers. *See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663-64, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). A federal court should therefore only find that a state law is preempted when doing so aligns with the "clear and manifest purpose of Congress," a standard that can be satisfied either through the statute's express language or by analyzing its overall structure and underlying objectives. *Id.*

In the context of hemp regulation, the 2018 Farm Bill serves as a prime example of Congress explicitly choosing not to displace state law. The statute's language clearly communicates congressional intent to preserve the ability of states and Indian tribes to enact their own hemp-related laws, even if such laws are more restrictive than the federal provisions. SUMF ¶ 10. The 2018 Farm Bill provides:

6

> **(A) No Preemption** - **Nothing in this subsection preempts or limits any law of a State or Indian tribe that –** *(i) regulates the production of hemp; AND (ii) is more stringent than this subchapter.*

*Id.* (emphasis added.) This unambiguous declaration underscores that Congress not only refrained from preempting more restrictive state hemp laws but also expressly preserved the states' authority to enact such regulations. As plainly stated in the statute, Congress made an unequivocal decision that the federal framework for hemp production would not override stricter state or tribal laws. *Id.*

Against this backdrop, Plaintiff's claim of preemption arises not from an express or implied theory of preemption, but rather from an argument rooted in conflict preemption. Doc. 1, 11-14. According to Plaintiff, the 2018 Farm Bill is in direct conflict with HB 1125, and therefore, under the Supremacy Clause, federal law should override and invalidate the state statute. *Id.* Conflict preemption applies when compliance with both federal and state law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Arizona v. United States*, 567 U.S. 387, 399 (2012).

However, HB 1125 does not present such a conflict. On the contrary, it operates in harmony with the 2018 Farm Bill by establishing more stringent regulations for hemp within South Dakota—a right the Farm Bill explicitly preserves. *See* SUMF, ¶ 10, 14-15. The 2018 Farm Bill created a federal framework for the legal cultivation and production of hemp, removing hemp with less than 0.3% THC from the Controlled Substances Act and providing

7

minimum national standards.  SUMF, ¶ 5-7.  Crucially, Congress included a non-preemption clause making clear that states retain the authority to regulate hemp more strictly than the federal baseline. SUMF, ¶ 10.  This clause underscores Congress's intent to respect state sovereignty in this area, permitting states to tailor hemp policies to address local concerns such as public health, safety, and law enforcement priorities.  *See CSX Transp., Inc.*, 507 U.S. at 663-64.

HB 1125 is a direct exercise of this reserved authority.  Rather than obstructing the federal scheme, it complements it by imposing additional safeguards that apply only within South Dakota's borders.  Thus, HB 1125 and the 2018 Farm Bill are not in conflict; they function as parallel and compatible layers of regulation, with the federal law providing a floor and the state law establishing a ceiling.

Furthermore, HB 1125 represents a valid and constitutionally sound exercise of the State's inherent police powers, which are expressly reserved to the states under the Tenth Amendment to the United States Constitution.  As courts have consistently recognized, "[s]tate governments historically possess police power to protect public health and safety." *R.J. Reynolds Tobacco Co. v. City of Edina*, 60 F.4th 1170, 1176 (8th Cir. 2023) (citing U.S. Const. amend. X).

This principle is well-rooted in constitutional jurisprudence.  In *Jacobson v. Massachusetts*, the Supreme Court upheld a state's authority to enforce compulsory vaccination laws, establishing that the state may enact reasonable

regulations to protect public health, even when doing so restricts individual liberties. 197 U.S. 11, 25 (1905). More recently, in *Gonzales v. Raich*, the Supreme Court reaffirmed that the states retain primary authority over health and safety regulation, noting that "the regulation of health and safety matters is primarily, and historically, a matter of local concern." *Gonzales v. Raich*, 545 U.S. 1, 42 (2005).

HB 1125 falls squarely within this well-established domain of state authority, as it was enacted with the express purpose of promoting and safeguarding the health, safety, and welfare of South Dakota residents. *Id.* By restricting public access to products that the State has reasonably determined to be harmful, the law serves a legitimate public health objective. *Mugler, supra.* In doing so, it reflects the State's obligation—and constitutional prerogative—to enact preventative measures that mitigate public health risks. *See Slaughter-House Cases*, 83, U.S. 36, 62, 21 L. Ed. 394 (1872). Such legislation is consistent with the state's longstanding police powers and aligns with judicial precedent that upholds the right of states to take proactive steps in protecting their populations from harm. *Id.* (citing *Gibbons v. Ogden*, 9 Wheaton, 203).

As this Court has already stated, the 2018 Farm Bill specifically disavows preemption; says nothing about whether a state may prohibit the sale of industrial hemp; and, in fact, allows states to be "more stringent" in regulating hemp production. Doc. 31, 10 (citing *N. Va. Hemp and Ag. LLC v. Virginia*, 2023 WL 7130853, at * 24 (E.D. Va. Oct. 2023). Therefore, HB 1125

9

and the 2018 Farm Bill exist in harmony without risk of preemption. Moreover, the "No Preemption" clause in the 2018 Farm Bill demonstrates the "clear and manifest purpose of Congress," not to preempt state action. *CSX Transp., Inc.*, 507 U.S. at 663-64. HB 1125 is not preempted by federal law.

    B. *HB 1125 does not interfere with interstate commerce.*

Plaintiff alleges that HB 1125 impermissibly interferes with interstate commerce and that HB 1125 violates the Commerce Clause of the United States Constitution. Doc. 1, 14-15. HB 1125 does not regulate the possession or transportation of hemp products and does not offend either the 2018 Farm Bill or the Commerce Clause. HB 1125 expressly regulates the *sale* and *manufacture* of certain hemp products. SUMF ¶ 14. Critical to this matter, HB 1125 does not prohibit the possession or transportation of hemp or related products. *Id.* No interpretation of HB 1125 could equate the process of transporting regulated products through South Dakota to the sale or manufacture of those products as defined in the bill.

The 2018 Farm Bill bars states or tribes from prohibiting "transportation or shipment of hemp or hemp products…" SUMF ¶ 6. Nowhere in the language of HB 1125 does the South Dakota Legislature attempt to prohibit the possession or transportation of hemp products as Plaintiff contends. SUMF ¶ 14. In its entirety, HB 1125's criminal prohibition reads as follows:

> No person or entity may:
>
> (3)    Chemically modify or convert industrial hemp as defined in § 38-35-1, or engage in any process that converts cannabidiol, into delta-8 tetrahydrocannabinol, delta9 tetrahydrocannabinol, delta-

> > 10 tetrahydrocannabinol, or any other tetrahydrocannabinol isomer, analog, or derivative; or
>
> (2)   Sell or distribute industrial hemp or an industrial hemp product that contains chemically derived cannabinoids or cannabinoids created by chemically modifying or converting a hemp extract.
>
> A violation of this section is a Class 2 misdemeanor.

*Id.* Transporting hemp or hemp products through South Dakota is an activity distinct from chemically modifying or converting industrial hemp. Likewise, transporting is an activity distinct from the sale or distribution of industrial hemp products. Plaintiff's claim that South Dakota, through HB 1125, intends to criminalize the transportation of hemp products in violation of the 2018 Farm Bill is simply not supported by the language of the law. *Id.*

Plaintiff seeks to draw a parallel between South Dakota's HB 1125 and the legislative provisions at issue in *Bio Gen, LLC v. Sanders*, 690 F. Supp. 3d 927 (E.D. Ark. 2023), but the comparison fails. In *Bio Gen*, the State of Arkansas enacted legislation aimed at regulating hemp that, among other things, prohibited the transfer and possession of hemp products within its borders. *Id.* However, the statute included a narrow and vaguely articulated exception for the "continuous transportation" of hemp through the state. *Id.*

Notably, the term "continuous transportation" was left undefined within the statute, leading to ambiguity regarding its meaning and application. *Id.* This lack of clarity created a legal landscape wherein a lawful transporter of hemp—acting in full compliance with federal law under the 2018 Farm Bill— could nonetheless face criminal liability if detained or delayed while traveling

11

through Arkansas, thereby interrupting the continuity of transport. *Id.* Recognizing this conflict, the federal district court in *Bio Gen* found that such ambiguity created a fundamental inconsistency with federal law. *Id.* Specifically, the 2018 Farm Bill legalized hemp and its derivatives nationwide, including during interstate transportation. *SUMF,* ¶ 5–7. Thus , the court concluded that the Arkansas statute was preempted to the extent it criminalized conduct that the Farm Bill expressly permits. *Bio Gen*, 690 F. Supp. 3d at 934–36.

However, on appeal, the Eighth Circuit reached a different conclusion. It held that "continuous transportation" is already well-defined under federal law. *Bio Gen LLC v. Sanders*, 2025 WL 1740322 (C.A.8 (Ark.)), 4. Relying on Supreme Court precedent, the court noted that a "temporary pause" does not remove a shipment from continuous interstate commerce; as long as there is a "practical continuity of movement," the goods remain in the stream of interstate transportation. *Id.* (citing *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568, 63 S.Ct. 332, 87 L.Ed. 460 (1943)). Accordingly, the disputed aspects of the Arkansas statute were upheld as valid. *Id.* Therefore, even if HB 1125 were to include similar language regulating the transportation of industrial hemp products—which it does not—such provisions would likely withstand constitutional scrutiny.

By contrast, HB 1125 is readily distinguishable and does not suffer from the same legal vulnerabilities. Unlike the Arkansas statute, HB 1125 does not attempt to regulate the transportation of hemp—whether continuous or

otherwise—through the State of South Dakota. SUMF ¶ 14–15. In fact, no provision of HB 1125, or of any other relevant South Dakota statute, imposes restrictions on the mere act of transporting legally recognized hemp through the state. *Id.*

Further, HB 1125 specifically targets the deliberate chemical modification of hemp-derived products as well as their sale or distribution. *Id.* The bill criminalizes the intentional alteration of hemp in ways that produce intoxicating effects. *Id.* Such a prohibition is well within the state's traditional police powers and is consistent with the language or purpose of the 2018 Farm Bill. *R.J. Reynolds supra.* Likewise, in Virginia and Hawaii, the district courts found that "Congress'[s] silence in the 2018 Farm Act on matters beyond regulating hemp production does not necessarily preclude the [state] from regulating areas in addition to hemp production." *Duke's Invs.,* 2022 WL 17128976, at *5; *N. Va. Hemp & Agric. LLC v. Virginia,* 1:23-cv-1177 (LMB/IDD), 700 F.Supp.3d 407, 421-22 (E.D. Va. Oct. 30, 2023). The federal statute legalizes hemp and hemp-derived products with a delta-9 THC concentration of no more than 0.3% on a dry weight basis, but it does not require states to permit the sale or distribution of synthetically altered hemp products, particularly those designed to circumvent controlled substance laws. SUMF ¶ 6-11.

Finally, aside from looking exclusively at the text of the statute, it is relevant to consider Congress's intent in passing the Farm Bill for the purposes of preemption. It is illogical that Congress would have intended for states'

authority to regulate hemp production to stop at the cultivation of the plant. *HW Premium CBD v. Reynolds*, 742 F. Supp. 3d 885, 899 (S.D. Iowa 2024). Moreover, HB 1125 neither regulates nor restricts interstate commerce in any unconstitutional manner. The statute does not erect barriers to lawful trade between states, nor does it discriminate against or unduly burden out-of-state economic interests. *Id.* Its focus is narrow and well-defined, targeting specific conduct within South Dakota's jurisdiction. Accordingly, HB 1125 does not run afoul of the Commerce Clause of the U.S. Constitution and is not preempted by federal law. Courts should not strain to create a conflict between state and federal law when one does not clearly exist. *Id.* (citing *English v. General Elec. Co.,* 496 U.S. at 90, 110 S.Ct. 2270).

In short, Plaintiff's reliance on *Bio Gen* is misplaced—especially in light of the Eighth Circuit's decision. Not only does *Bio Gen* fail to support the contention that HB 1125 is preempted by federal law, but it now likely stands for the opposite proposition. Accordingly, HB 1125 represents a lawful and measured exercise of the state's authority to regulate potentially harmful substances within its borders.

    C. *HB 1125 does not constitute an unconstitutional regulatory taking.*

Plaintiff asserts that HB 1125 results in an unconstitutional regulatory taking in violation of the Fifth Amendment. Doc. 1, 15-16. A substantial portion of Plaintiff's business operations center on the sale and distribution of hemp-derived products. SUMF, ¶ 20. Plaintiff alleges that these products would be rendered illegal upon the enactment of HB 1125, thereby effectively

14

eliminating a major segment of its commercial activity.  Doc. 1, 15-16.  *See also* SUMF ¶ 20.

However, as this Court has previously articulated, the legal inquiry in a regulatory taking claim does not hinge upon the innocence or lawful intent of the Plaintiff.  Doc. 31, 14-15. (citing *Bennis v. Michigan*, 516 U.S. 442, 452-453, 116 S.Ct. 994, 134 L.Ed.2d 68 (1996).  Instead, the focus must remain on the nature of the government action and whether it qualifies as a taking under constitutional standards.  *Id.*  In this case, the State maintains that any property interests affected by the implementation of HB 1125 are not taken for "public use" as defined by the Takings Clause.  Doc. 34.  Consequently, such a deprivation does not rise to the level of a compensable taking under the Fifth Amendment.

> The Supreme Court held in *Mugler v. Kansas* that:
>
> A prohibition upon the use of property for purposes that are declared by valid legislation, to be injurious to health, morals, or safety of the community cannot, in any sense, be deemed a taking or an appropriation of property for the public benefit, in the sense in which a taking of property by the exercise of the State's power of eminent domain is such a taking or appropriation.

*Mugler* 123 U.S. at 668-69 (1887).  In *Mugler*, an alcohol manufacturer sued the state following the enactment of legislation prohibiting the previously legal manufacture and sale of alcohol.  *Id.*  The Supreme Court held that the State's police powers enabled such prohibition and the manufacturer's economic interests did not constitute a taking for public use.  *Id.*

As the Supreme Court has explained, "The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth

15

[Amendment], provides that private property shall not 'be taken for public use, without just compensation.'" *Schmidt v. Ramsey*, 860 F.3d 1038, 1046 (8th Cir. 2017) (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005)). This principle, however, does not extend to situations in which property is seized or rendered valueless as a result of the enforcement of criminal laws or the State's exercise of its police powers. Courts have consistently held that such losses do not constitute takings. "[W]hen property has been seized pursuant to criminal laws . . . such deprivations are not 'takings' for which the owner is entitled to compensation." *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1331 (Fed. Cir. 2006). *See also Bennis v. Michigan*, 516 U.S. 442, 452-53, 116 S.Ct. 994, 134 L.Ed.2d 68 (1996); *Mugler v. Kansas*, 123 U.S. at 623, 668-69 (1887); *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 680, 94 S.Ct. 2080, 40 L.Ed. 452 (1974); *Van Oster v. Kansas*, 272 U.S. 465, 468, 47 S.Ct. 133, 71 L.Ed. 354 (1926); *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 125 (1978).

Thus, HB 1125 does not constitute an impermissible taking under the Constitution. Even if there is a loss of property value or business opportunity resulting from the legislation, such a loss would not be for "public use" as contemplated by the Fifth Amendment. If a taking is not for public use, then the affected property owner is not entitled to just compensation. *Bennis v. Michigan*, 516 U.S. at 452, 116 S.Ct. 994, 134 L.Ed.2d 68 (1996). In *Bennis*, the Court held that "the government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of

16

governmental authority other than the power of eminent domain. *Id.* at 452. As further confirmed by federal precedent, "[p]roperty seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause." *AmeriSource Corp. v. United States*, 525 F.3d 1149, 1153 (Fed. Cir. 2008); *see also United States v. Romero*, No. 1:12-CR224, 2013 WL 625338, at *5 (D.N.D. Feb. 20, 2013).

HB 1125 represents a legitimate exercise of the State of South Dakota's police powers. Through such authority, the State Legislature is empowered to enact laws aimed at protecting and promoting the health, safety, and general welfare of its residents. *Mugler, supra.* As such, any incidental economic impact or loss of property that results from the legislative decision to regulate or prohibit contraband substances—including hemp-derived products—is not a taking for "public use" within the meaning of the Fifth Amendment and is, therefore, not compensable. *Id.*

### D. HB 1125 is not unconstitutionally vague.

Plaintiff contends that House Bill 1125 (HB 1125) should be declared void for vagueness under the Due Process Clause of the Constitution. Doc. 16-18. Under established constitutional law, a statute is unconstitutionally vague if it "either forbids or requires the doing of an act in terms so vague that men of ordinary intelligence must necessarily guess at its meaning and differ as to its application." *Bio Gen, LLC*, 690 F. Supp. 3d at 940. This standard ensures that laws provide sufficient clarity and guidance so that individuals may

reasonably understand what behavior is prohibited and avoid arbitrary enforcement.

In the present case, HB 1125 clearly articulates both its purpose and its prohibitions, and it does so in a manner that withstands constitutional scrutiny. The statute prohibits the chemical modification or conversion of industrial hemp as well as the sale or distribution of industrial hemp products that contain chemically derived cannabinoids. SUMF ¶ 14. This statutory language is straightforward and understandable to a person of ordinary intelligence. It leaves little room for ambiguity or subjective interpretation regarding what conduct is prohibited.

Moreover, where potential ambiguity could have existed—especially given prior litigation such as *Bio Gen*—HB 1125 explicitly addresses and resolves those uncertainties. The law provides a precise definition of "chemically derived cannabinoid," and simultaneously amends the existing statutory definition of "industrial hemp product" to exclude certain categories of chemically derived cannabinoid products. SUMF ¶ 15. In doing so, HB 1125 directly responds to the issues raised in *Bio Gen*, offering greater specificity and avoiding the vagueness that the court found problematic in that case. *Bio Gen, LLC, supra*. Specifically, HB 1125 defines a "chemically derived cannabinoid" as:

> A chemical substance created by a chemical reaction that changes the molecular structure of any chemical substance derived from the cannabis plant. *The term does not include:*

      (a) Cannabinoids produced by decarboxylation from a naturally occurring cannabinoid acid without the use of a chemical catalyst;

      (b) Non-psychoactive cannabinoids; or

      (c) Cannabinoids in a topical cream product.

SUMF ¶ 15 (emphasis added).  This detailed and structured definition eliminates guesswork by outlining both what is included and what is excluded from the statute's reach.  It draws a clear boundary between permitted and prohibited substances and does so using commonly understood scientific terminology while also defining terms where necessary.

In addition, while the 2018 Farm Bill provides the federal framework for industrial hemp regulation, it expressly allows states to enact more restrictive standards regarding the cultivation, processing, and sale of hemp and hemp-derived products.  SUMF ¶ 10.  Therefore, HB 1125 operates well within the authority granted to the State of South Dakota under federal law.

Taken together, the plain language of HB 1125, its specific definitions, and its targeted amendments to existing law demonstrate that it is neither vague nor constitutionally infirm.  The statute provides clear guidance to those it governs and ensures that enforcement will not be arbitrary or discriminatory.  Consequently, Plaintiff's void-for-vagueness challenge under the Due Process Clause lacks merit and should be rejected.

## CONCLUSION

WHEREFORE, Defendants pray that Plaintiff's Complaint for Declaratory and Injunctive Relief be dismissed with prejudice, that Defendants recover their costs and disbursements, and for such other and further relief that the Court deems proper and just.

Dated this 14th day of July, 2025.

                                          */s/ Grant M. Flynn*
                                          Grant M. Flynn
                                          Assistant Attorney General
                                          1302 E. Hwy 14, Suite 1
                                          Pierre, SD  57501-8501
                                          Telephone: (605) 773-3215
                                          E-mail: atgservice@state.sd.us

usdc_GMF (mb)